UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
In re:

RAM DISTRIBUTION GROUP LLC
*dba* TAL DEPOT,

       Debtor.
-------------------------------------------------------------x
RAM DISTRIBUTION GROUP LLC
*dba* TAL DEPOT,

      Plaintiff,

    -against-

JOSEPH GUNNAR & CO., LLC,

      Defendant.
-------------------------------------------------------------x

Chapter 11

Case No.: 8-19-72701-las

Adv. Pro. No.: 8-20-08081-las

## MEMORANDUM DECISION AND ORDER GRANTING DEFENDANT'S MOTION TO DISMISS COMPLAINT

  Plaintiff Ram Distribution Group LLC d/b/a Tal Depot ("plaintiff" or the "Company"), the debtor in this chapter 11 case, commenced this adversary proceeding against defendant Joseph Gunnar & Co., LLC ("defendant" or "Joseph Gunnar") asserting claims for breach of contract and breach of the implied duty of good faith and fair dealing. Complaint ("Compl.") [Dkt. No. 1]. According to plaintiff, this dispute stems from a January 2017 engagement letter between the parties under which defendant agreed to act as financial advisor to plaintiff in connection with a proposed initial public offering of plaintiff's securities. Plaintiff claims wrongful conduct by defendant precluded plaintiff's completion of the public offering process and that defendant failed to fulfill its obligations under the engagement letter.

  The Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1334(b), 28 U.S.C. § 157(a), and the Standing Order of Reference entered by the United States District

Court for the Eastern District of New York, dated August 28, 1986, as amended by Order dated December 5, 2021.

Now before the Court is defendant's motion to dismiss plaintiff's Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.") and made applicable to this adversary proceeding by Bankruptcy Rule 7012(b). The Court has carefully considered the arguments and submissions of the parties in connection with the motion to dismiss. For the following reasons, the Court grants defendant's motion to dismiss the Complaint.

## BACKGROUND

A.  Facts[1]

Plaintiff is an online grocer, selling nonperishable groceries on its own website as well as on third-party seller websites. Compl. ¶ 1. Plaintiff started its business in 2012 and annual revenues grew over the next six years from $250,000 in 2012 to $35 million in 2018. *Id*. ¶ 9. Plaintiff had plans for its continued growth and needed increased funding for its expansion. *Id*. ¶ 10. In the last quarter of 2016, plaintiff began looking at various options to secure funding. *Id*.

Plaintiff alleges that it was introduced to defendant in December 2016. Compl. ¶ 11. At that time, plaintiff's President and Chief Executive Officer, Jeremy Reichman, began communicating with representatives of defendant, including Ramnarain Jaigobind and Eric Lord. *Id*. According to plaintiff, defendant advised that the best option to secure funding was by an initial public offering ("IPO"). *Id*. Plaintiff further claims that defendant represented that it could obtain a $75 million valuation for plaintiff, that Mr. Jaigobind would lead the

---

[1] The facts stated are taken from plaintiff's Complaint [Dkt. No. 1], unless otherwise noted and are accepted as true for the purposes of this motion. *See Koch v. Christie's Int'l PLC*, 699 F. 3d 141, 145 (2d Cir. 2012). However, "[t]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). References to the allegations in the Complaint should not be construed as a finding of fact by the Court, and the Court makes no such findings.

team of bankers on the IPO, and that Mr. Jaigobind could secure interim bridge financing for plaintiff during the IPO process. *Id.*

The engagement letter ("Letter" or "engagement letter"), which sets forth the parties' agreement for the IPO process, was executed on January 6, 2017, and is attached to the Complaint as Exhibit A. Compl. ¶ 12. The Letter states that defendant will "act as the Company's exclusive financial advisor, sole book-runner, sole underwriter and sole investment banker in connection with the proposed Offering or any other public financing." Compl. Ex. A, ¶ 1. The Letter further states that defendant will "use its best efforts, consistent with customary practice, during the Engagement Period to provide all investment banking services customarily provided in connection with transactions such as the proposed Offering." *Id.*

Although the opening paragraph of the Letter expressly states that it "is not intended to be a binding legal document," Paragraph 12 of the Letter provides that Paragraphs 1, 12, 13, 14, 17, 18, and 20 "are intended to be legally binding and enforceable on and against the Company and Joseph Gunnar." *Id.* ¶ 12(a). Paragraph 12 further states that the Letter is not "a legal commitment on the part of Joseph Gunnar to provide any financing to the Company, as the agreement between the parties hereto on these matters will be embodied in the Underwriting Agreement" and that "[u]ntil the Underwriting Agreement has been finally negotiated and signed, the Company or Joseph Gunnar may at any time terminate their further participation in the proposed transactions contemplated hereby and the engagement by the Company of Joseph Gunnar, and the party so terminating will have no liability to the other on account of any matters provided for herein, except as provided for in this Paragraph." *Id.*

Section (b) of Paragraph 12 of the Letter states what will occur should the engagement letter be terminated. If either party terminates its participation in the proposed transaction

"after the 180-day anniversary of the execution of [the] engagement letter," defendant is entitled to reimbursement of "expenses and fees" as provided for in Paragraph 8, as well as the "full amount of its actual accountable expenses . . . up to a maximum of $100,000." *Id.* ¶ 12(b). If plaintiff terminated the Letter prior to the 180-day anniversary "for any reason," it was obligated to pay defendant $100,000 "inclusive of actual accountable expenses incurred up to such termination date." *Id.* The two circumstances under which defendant would not be entitled to payment or reimbursement upon termination are (1) if defendant terminated the Letter "prior to the execution of the Underwriting Agreement for other than Good Reason"[2] or (2) if plaintiff terminated the Letter due to "Joseph Gunnar's gross negligence or willful misconduct." *Id.*

The first sentence of Paragraph 1 and the entirety of Section (b) of Paragraph 12 of the Letter were amended by letter agreement signed by the parties and dated October 19, 2017. *See* Compl. Ex. B. In pertinent part, the amendment states that the engagement period runs from the date of the amended engagement letter to "the earlier of the consummation of the Offering or October 6, 2018, unless sooner terminated." *Id.* The amendment further states that the Company may not terminate the Letter until July 6, 2018, except for as otherwise provided in the engagement letter or "pursuant to paragraph 12 of this engagement letter." *Id.* The amended engagement letter does not otherwise modify payment or reimbursement to Joseph Gunnar should the Letter be terminated. *See id.*

According to the Complaint, the "customary practice" of an investment bank during the IPO process includes "(a) engaging in the due diligence process, (b) participating in the development of Form S-1 to be drafted, amended as necessary, and filed with the Securities and Exchange Commission (the 'SEC'), (c) preselling the offering and (d) conducting a

---

[2] "Good Reason" is defined under Section (c) of Paragraph 12 of the Letter.

roadshow." Compl. ¶ 15. The Complaint alleges, albeit in conclusory fashion, these are "well-known, basic and necessary steps in the IPO process that eventually leads to the investment bank and the company executing an underwriting agreement." *Id*. ¶ 18. The only reference to any of these "customary practices" in the Letter is found in Paragraph 9, which states "Joseph Gunnar *may* plan and arrange one or more 'road show' marketing trips for the Company's management to meet with prospective investors." Compl. Ex. A, ¶ 9 (emphasis added). Notably, Paragraph 9 is excluded from those provisions in the Letter the parties intended to be legally binding and enforceable. *Id*. ¶ 12(a).

The Complaint alleges that the IPO process was very costly both financially and in terms of its use of plaintiff's personnel resources. Compl. ¶¶ 19–20. Furthermore, plaintiff states that one of the reasons it "agreed to do the IPO" – that Mr. Jaigobind would be working on the IPO – was hindered when plaintiff was informed that "Mr. Jaigobind was no longer affiliated with [d]efendant." *Id*. ¶ 22. This news concerned plaintiff because it understood this to mean that the team of investment bankers who had been working with Mr. Jaigobind on the IPO would now leave to join Mr. Jaigobind at his new employer. *Id*. However, despite this concern, plaintiff was assured by defendant that no one would leave, and that defendant could fulfill its obligations pursuant to the engagement letter. *Id*. ¶ 23.

The Complaint further alleges that defendant (1) made no effort to obtain bridge financing for plaintiff during the IPO process; (2) "forc[ed]" plaintiff to accept a reduced valuation of $25 million and file a Form S-1 with the lower valuation; (3) continued the IPO process when defendant knew it could not complete the process; and (4) convinced plaintiff to file a confidential "free writing prospectus" ("FWP") presentation, which was created for a roadshow that defendant knew it could not do. *Id*. ¶ 33.

After plaintiff filed the FWP presentation, this signaled "that [p]laintiff was ready to go public." *Id*. ¶ 29. However, it was at this point in the IPO process that plaintiff learned that the team at Joseph Gunnar who had been working on the IPO had resigned and were employed by the investment bank where Mr. Jaigobind was then employed. *Id*. ¶ 30. Due to the exodus of the team, the Complaint states that "[d]efendant admitted to [p]laintiff" it was not able to engage in presale activities, arrange meetings with investors, or go on roadshows "because [d]efendant had no representatives to work on any tasks with the loss of the entire team it had working on the IPO." *Id*. According to plaintiff, it should have been obvious to defendant that loss of the team leader and other team members on the transaction meant defendant could not fulfill its obligations under the Letter. *Id*. ¶ 31.

Plaintiff alleges that because of defendant's "bad faith, gross negligence and willful misconduct" its business was "financially devastated," and plaintiff was "forced to file for bankruptcy." *Id*. ¶ 38.

B.  Procedural History

Plaintiff filed a petition for relief under chapter 11 of the Bankruptcy Code on April 12, 2019. [Bankr. Dkt. No. 1].[3] This adversary proceeding against defendant was commenced by the filing of the Complaint on May 22, 2020. [Dkt. No. 1]. On July 17, 2020, defendant responded by filing a motion to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim for relief [Dkt. No. 12], and, in support, a memorandum of law [Dkt. No. 13]. Plaintiff filed opposition to that motion on September 4, 2020 [Dkt. No. 23], and defendant filed a reply on October 5, 2020. [Dkt. No. 30].

---

[3] Docket references to the Company's main bankruptcy case, Case No. 8-19-72701-las, are cited as "[Bankr. Dkt. No. __]". The Company filed its Fifth Amended Plan of Reorganization on October 1, 2021 [Bankr. Dkt. No. 315] and a proposed modification to the plan on February 16, 2022 [Bankr. Dkt. No. 345]. A hearing to consider the latest iteration of the Company's chapter 11 plan is scheduled for March 10, 2022.

STANDARD OF REVIEW

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the ground upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (quoting Fed. R. Civ. P. 8(a)(2)). A defendant may move to dismiss a complaint under Rule 12(b)(6) for "failure to state a claim upon which the relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss under Rule 12(b)(6) a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* To meet this standard, a plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant acted unlawfully." *Id.* The complaint's allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "In ruling on a motion pursuant to Fed. R. Civ. P. 12(b)(6), the duty of a court is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 113 (2d Cir. 2010) (internal citation and quotation marks omitted). Where a plaintiff has not "nudged [its] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570. "Applying this plausibility standard is a 'context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *McCall v. Chesapeake Energy Corp.*, 817 F. Supp. 2d 307, 312 (quoting *Iqbal*, 556 U.S. at 679).

Although all well-pleaded factual allegations in the complaint are assumed true for purposes of a motion to dismiss, *see Koch*, 699 F.3d at 145, this principle is "inapplicable to

legal conclusions," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. The Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco*, 622 F.3d at 111 (citations omitted); *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is part of the pleading for all purposes."). A court may also take judicial notice of matters of public record, including documents filed in other court proceedings, when considering a motion to dismiss. *See Kramer v. Time Warner Inc.*, 937 F.2d 767, 773–74 (2d Cir. 1991).

## DISCUSSION

### A.  Breach of Contract

The first cause of action in the Complaint is for breach of contract. Plaintiff states that under Paragraph 1 of the Letter, defendant "agree[d] to use its best efforts, consistent with customary practices, during the Engagement Period to provide all investment banking services customarily provided in connection with transactions such as the proposed [initial public offering]." Compl. ¶ 12 (quoting Compl. Ex. A, ¶ 1). According to plaintiff, defendant fell short of keeping its promise with respect to its role as financial advisor to plaintiff in connection with a public offering. Plaintiff thus alleges that defendant breached the Letter "by failing to provide all investment banking services customarily provided in connection with an [initial public offering]." *Id.* ¶ 41.

To state a claim for breach of contract under New York law, a plaintiff must allege four elements: "(1) the existence of an agreement, (2) adequate performance of the contract

by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *JJCC Real Estate LLC v. Brooklyn Renaissance, LLC* (*In re Brooklyn Renaissance, LLC*), 556 B.R. 68, 75 (Bankr. E.D.N.Y. 2016) (quoting *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996)); *Canzona v. Atanasio*, 989 N.Y.S.2d 44, 47 (2d Dep't 2014). When pleading the elements for a breach of contract claim, a plaintiff must identify "the specific provisions of the contract upon which liability is predicated." *Benihana of Tokyo, LLC v. Angelo, Gordon & Co., L.P.*, 259 F. Supp. 3d 16, 33 (S.D.N.Y. 2017) (citing *Sud v. Sud*, 621 N.Y.S.2d 37, 38 (1st Dep't 1995)), *aff'd*, 712 F. App'x 85 (2d Cir. 2018) (summary order); *Karmilowicz v. Hartford Fin. Servs. Group*, 2011 U.S. Dist. LEXIS 77481, at *15 (S.D.N.Y. July 14, 2011). Additionally, "[i]f a document relied on in the complaint contradicts allegations in the complaint, the document, not the allegations, control, and the court need not accept the allegations in the complaint as true." *Tuf America, Inc. v. Diamond,* 968 F. Supp. 2d 588, 592 (S.D.N.Y. 2013) (quoting *Poindexter v. EMI Record Grp. Inc.,* No. 11 Civ. 559 (LTS), 2012 U.S. Dist. LEXIS 42174, at *6 (S.D.N.Y. Mar. 27, 2012) (internal quotation marks omitted).

"At the motion to dismiss stage, a district court may dismiss a breach of contract claim only if the terms of the contract [insofar as they are material to the dispute] are unambiguous." *Callahan v. Global Eagle Entm't, Inc.*, 2019 U.S. Dist. LEXIS 90822, at *7 (S.D.N.Y. May 30, 2019) (quoting *Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*, 830 F.3d 152, 156 (2d Cir. 2016)). Thus, as a threshold question, courts must consider if the terms of the contract are ambiguous. *Novartis Pharma AG v. Incyte Corp.*, 520 F. Supp. 3d 514, 525 (S.D.N.Y. 2021).

To determine whether the terms of a contract are ambiguous, courts look within the "four corners of the document, not to outside sources." *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir. 2009). Extrinsic evidence may not be introduced to show the parties

intended a meaning different from that which was expressed in the agreement. *Novartis Pharma AG*, 520 F. Supp. 3d at 524. A court analyzing the ambiguity of a contract provision should apply the "normal rules of contract interpretation" and give a full and plain meaning to the words and phrases. *Carlton Grp., Ltd. v. Mirabella SG SpA*, No. 16-CV-6649 (LGS), 2017 U.S. Dist. LEXIS 130589, at *10 (S.D.N.Y. Aug. 16, 2017). "[A] sensible meaning to the words should be sought." *Kass v. Kass*, 696 N.E.2d 174, 180 (N.Y. 1998). Furthermore, the court should analyze the entire contract and consider the "circumstances under which [the contract] was executed." *Id*.

A contract is not ambiguous if its language has a "definite and precise meaning," and there is "no reasonable basis for a difference of opinion." *Orchard Hill,* 830 F.3d at 156. A party may not create ambiguity by "strain[ing] the contract language beyond its reasonable and ordinary meaning.'" *Bank of N.Y. Mellon Trust Co., N.A. v. Gebert*, No. 13-CV-6988 (PKC), 2014 U.S. Dist. LEXIS 64511, at *8 (S.D.N.Y. May 9, 2014) (citing *Seiden Associates, Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992)). A court should interpret the provisions of the contract to protect "the reasonable expectations of the parties." *Id*.

A court cannot interpret a contract in such a way that would render any terms or provisions meaningless or superfluous. *Givati v. Air Techniques, Inc.*,960 N.Y.S.2d 196, 198 (2d Dep't 2013). Also, "the court may not write into a contract conditions the parties did not insert by adding or excising terms under the guise of construction, nor may it construe the language in such a way as would distort the contract's apparent meaning." *Georgitsi Realty, LLC v. Penn-Star Ins. Co.*, 702 F.3d 152, 155 (2d Cir. 2012) (quoting *In re Matco-Norca, Inc.*,802 N.Y.S.2d 707, 709 (2d Dep't 2005)).

With these legal principles in mind, the Court now turns to the factual allegations in the Complaint and addresses plaintiff's breach of contract claim. As noted, plaintiff argues

that defendant failed "to provide all investment banking services customarily provided in connection with transactions such as the proposed Offering." Compl. ¶ 12. These services, according to plaintiff, include "(a) engaging in the due diligence process, (b) participating in the development of Form S-1 to be drafted, amended as necessary, and filed with the Securities and Exchange Commission (the 'SEC'), (c) preselling the offering and (d) conducting a roadshow." *Id.* ¶ 15. Notably absent from the Complaint is any citation to the Letter where these four specific services are explicitly listed, obligating defendant to perform. However, plaintiff argues that these tasks are "well-known, basic and necessary steps in the IPO process that eventually leads to the investment bank and the company executing an underwriting agreement." *Id.* ¶ 18. Furthermore, in its opposition to defendant's motion to dismiss, plaintiff states that evidence that the services are "customarily provided" in connection with an IPO can be found "referenced throughout the Engagement Letter" and cites to Paragraphs 6–11 and 15. Memorandum of Law in Opposition to Joseph Gunnar & Co., LLC's Motion to Dismiss ("Pl.'s Opp'n") 3. Paragraphs 6-11 and 15, however, are excluded from the provisions of the Letter the parties intended to be legally binding and enforceable. Compl. Ex. A, ¶ 12(a).

To begin with, plaintiff has sufficiently alleged that an agreement exists between the parties, and defendant does not dispute the existence of the agreement.[4] Defendant, however, contends that the engagement letter was not intended to be a legally binding document save for certain specified provisions.[5] Def.'s Mot. 1–2. Defendant cites Paragraph 12(a) as limiting

---

[4] Thus, there is no dispute as to whether the first element necessary to sufficiently state a claim for breach of contract is alleged. As for the second element, defendant has not asserted that plaintiff failed to adequately allege that it performed the contract. The heart of the dispute is the third element as defendant's principal argument is that plaintiff has not adequately alleged a breach.

[5] Defendant's motion to dismiss concedes there are binding and non-binding provisions in the engagement letter. The crux of defendant's argument, however, is that the provisions of the engagement letter upon which plaintiff premises its breach of contract claim are not binding on the parties.

the legally binding provisions of the engagement letter to Paragraphs 1, 12, 13, 14, 17, 18, and 20. Defendant then cites Paragraph 20 as expressly stating that defendant will have no liability to plaintiff "except for any such liability for losses, claims, damages or liabilities incurred by [defendant] that are finally judicially determined to have resulted from the bad faith or gross negligence of [defendant or its affiliates]." *Id*. at 2. Defendant maintains that plaintiff has not pleaded sufficient facts to support an otherwise conclusory statement that defendant engaged in any wrongful conduct rising to the level of bad faith or gross negligence, and the Complaint should, therefore, be dismissed. *Id*. Finally, defendant argues that nothing in the Letter requires it "to perform any specific categories of tasks or take any specified actions in furtherance of the engagement." *Id*. According to defendant, based on the "unambiguous" language of the engagement letter, "[p]laintiff simply cannot maintain its claim for breach of contract for failure to deliver on 'promises' that were never made." *Id*.

Based on the allegations in the Complaint, plaintiff's breach of contract claim turns on whether defendant was obligated by the Letter to "(a) engag[e] in the due diligence process, (b) participat[e] in the development of Form S-1 to be drafted, amended as necessary, and filed with the Securities and Exchange Commission (the 'SEC'), (c) presell[] the offering and (d) conduct[] a roadshow." Compl. ¶15. Plaintiff claims that these specific tasks are referenced throughout the Letter and evidence that the parties contemplated that defendant would be obligated to perform these tasks in connection with the IPO process. Pl.'s Opp'n 3. Plaintiff does not assert that the engagement letter is ambiguous, and the Court therefore gleans the parties' intent "from the four corners of the agreement." *Fleming v. Fleming*, 137 A.D. 3d 1206, 1207 (1st Dep't 2016) (citation omitted); *see LaSalle Bank Nat'l Ass'n v. Nomura Asset Cap. Corp*., 424 F. 3d 195, 208 n.10 (2d Cir. 2005).

Looking within the four corners of the parties' agreement, the Court notes there are several services listed which defendant was obligated to provide to plaintiff in connection

with the IPO process. Instead of arguing defendant failed to perform one of these enumerated services, or even allege which services defendant wrongfully performed, plaintiff creates, ostensibly from thin air, four distinct services that are either not referenced in the Letter or contradicted by its terms altogether. And it is on these four distinct services that plaintiff's breach of contract action is premised.

Although the Letter references defendant's obligation to engage in the due diligence process,[6] the Complaint does not allege facts that suggest defendant did not engage in due diligence. To the contrary, the Complaint pleads the exact opposite. Paragraph 24 states that defendant performed a valuation of plaintiff's business and advised plaintiff to "complete an audit for the first quarter of 2018 before completion of the Form S-1;" Paragraph 27 alleges that defendant urged plaintiff to "file a presentation that contained more concise and easy to read information about plaintiff as a 'free writing prospectus' (the 'FWP') to be used for the roadshow;" and Paragraph 28 alleges that defendant practiced roadshow presentations with plaintiff's CEO, Mr. Reichmann. *See* Compl. ¶¶ 24, 27, 28. Though plaintiff may have been less than satisfied with how defendant performed its due diligence to the extent required to do so, it has not adequately and plausibly stated a claim that defendant did not engage in due diligence.

Plaintiff argues that defendant was obligated to "participat[e] in the development of Form S-1 to be drafted, amended as necessary, and filed with the Securities and Exchange Commission (the 'SEC')." *Id.* ¶ 15. The Compliant, however, does not allege that defendant did not participate in the development of the Form S-1. To the contrary, the facts alleged in

---

[6] Paragraph 2 references that defendant "will act as sole underwriter of the Offering, subject to … completion of [defendant's] due diligence examination of the Company and its affiliates…." Paragraph 8 references defendant's cooperation in obtaining "the necessary approvals and qualifications in such states as [defendant] reasonably deems necessary and/or desirable." Paragraph 11(a) references defendant's due diligence investigation of plaintiff's employees and officers, as well as its financial statements. Again, the Court notes that these paragraphs are not included in the list of paragraphs the parties intended to be legally binding and enforceable. *See* Compl. Ex. A, ¶ 12(a).

the Complaint show that defendant did participate in the Form S-1 development. Paragraph 24 discusses that the Form S-1 was filed on March 14, 2018, and defendant urged plaintiff to "complete an audit for the first quarter of 2018 before completion of the Form S-1." *Id*. ¶ 24. Additionally, Paragraph 6 of the engagement letter discusses preparation of a Registration Statement on Form S-1 and provides that it is to be "in form reasonably satisfactory to Joseph Gunnar" and contain the items specified in subparagraphs (i) and (ii) of Paragraph 6. Compl. Ex. A, ¶ 6. Hence, pursuant to the engagement letter, the Form S-1 would be reviewed and commented upon by Joseph Gunnar prior to filing with the SEC. Plaintiff filed the Form S-1 with the SEC on March 14, 2018. Compl. ¶ 24. Absent from the Complaint is any allegation that the Form S-1 was not reviewed and commented on by defendant prior to plaintiff's filing it with the SEC.

Although plaintiff argues that "preselling the offering" is a "customary practice" in the industry, there is not a single reference to preselling activities in the entire engagement letter or in its amendment. *Id*. ¶ 15. Plaintiff's contention that this task is referenced throughout the engagement letter and, thus, evidences a common industry practice cannot be sustained when the agreement does not mention preselling activities.

The Complaint further alleges that defendant was obligated to conduct a roadshow. *Id*. Paragraph 9 of the engagement letter states, "Joseph Gunnar *may* plan and arrange one or more "road show" marketing trips for the Company's management to meet with prospective investors." Compl. Ex. A, ¶ 9 (emphasis added).[7] Under the tenets of contract interpretation, the Court must provide a "plain and sensible" meaning to the words of a contract. *Kass*, 696 N.E.2d at 180. Here, the word "may" implies that defendant was under no obligation to perform a road show, but rather could conduct a road show at its discretion.

---

[7] It bears repeating that Paragraph 9 is not included in those paragraphs of the engagement letter the parties intended to be legally binding and enforceable. *See* Compl. Ex. A., ¶ 12(a).

Since plaintiff does not assert that defendant abused its discretion in deciding not to conduct a road show, it cannot be said that the Complaint adequately and plausibly pleads that defendant breached a promise it never made.

Even assuming that all factual allegations pleaded in the Complaint are true, as the Court must when considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), *see Koch*, 699 F.3d at 145, plaintiff has not adequately pleaded a breach of contract claim with respect to the four distinct services on which its claim is premised and has thus failed to "nudge[] [its] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. To read the engagement letter, as plaintiff argues, to include these specified services would require the Court to add terms that broaden the agreement reached by the parties and ignore provisions the parties expressly stated were not legally binding and enforceable. This, the Court declines to do. *See Georgitsi Realty, LLC*, 702 F.3d at 155.

Plaintiff further alleges in support of its breach of contract claim that defendant acted in "bad faith, gross negligence and willful misconduct" by

> (i) assuring [p]laintiff it would obtain bridge financing but making no effort to do so; (ii) forcing [p]laintiff to agree to reduce its valuation by two thirds after [d]efendant had repeatedly assured [p]laintiff that [d]efendant could complete the IPO at the originally agreed amount; (iii) knowingly leading [p]laintiff deeper and deeper into the IPO process when [d]efendant knew or should have known it could not complete that process; and (iv) deceptively convincing [p]laintiff to publicly file a highly confidential FWP Presentation that was created solely for a roadshow that [d]efendant knew it could not do.

*Id*. ¶ 33.

Generally, contracting parties are "free to enter into contracts that absolve a party from its own negligence." *Abacus Fed. Sav. Bank v. ADT Sec. Servs., Inc.*, 967 N.E.2d 666, 669 (N.Y. 2012). However, a party may not "insulate itself from damages caused by grossly negligent conduct." *Id*. To sufficiently plead gross negligence, a plaintiff must allege facts that "smack of intentional wrongdoing" or "that evince[] a reckless indifference to the rights

of others." *Id.* Defendant admits that its liability under the engagement letter is limited to acts of "bad faith or gross negligence." Def.'s Mot. 2. Nonetheless, defendant argues that the facts alleged in the Complaint do not rise to this level.

Regarding plaintiff's assertion that defendant was obligated to obtain bridge financing for plaintiff, defendant maintains that it never assured plaintiff that it would do so, and, in fact, the engagement letter "specifically disavows any 'promise' on the part of defendant" to obtain bridge financing. *Id.* at 10. The plain terms of the engagement letter show that defendant was not obligated to provide any financing to plaintiff:

> [T]his engagement letter is not intended to be a binding legal document nor a *legal commitment on the part of Joseph Gunnar to provide any financing to the Company*, as the agreement between the parties hereto on these matters will be embodied in the Underwriting Agreement.

Compl. Ex. A, ¶ 12(a) (emphasis added). Plaintiff has failed to adequately and plausibly plead defendant acted in bad faith or was grossly negligent in not providing bridge financing as the engagement letter disclaims any promise to provide financing to plaintiff. Additionally, the engagement letter does not obligate defendant to arrange for third-party bridge financing for plaintiff. Thus, any claim that defendant failed to procure such third-party bridge financing is unsupported and plaintiff has not sufficiently pleaded that defendant acted in bad faith or was grossly negligent in failing to do something it did not agree to.

The Complaint also alleges that plaintiff was "forced" by defendant to accept a lower "valuation by two thirds after defendant had repeatedly assured plaintiff that defendant could complete the IPO at the originally agreed amount." Compl. ¶ 33. Noticeably absent from the engagement letter is any mention of the $75 million valuation that plaintiff claims the defendant represented it could achieve. In fact, the Letter does not state any specific valuation is achievable. The Complaint also does not set forth any facts to show how plaintiff was "forced" into accepting a $25 million valuation. Though plaintiff may have been less than

satisfied with the valuation, the facts, as alleged, do not substantiate a claim of bad faith or gross negligence by defendant concerning an appropriate valuation. Additionally, Paragraph 3 of the Letter speaks to the size of the public offering, the number of shares to be offered and the offering price and states that these items "will be the subject of continuing negotiations, and subject to final agreement by the Company and Joseph Gunnar" and are dependent on certain factors, some of which are enumerated in the Letter. Compl. Ex. A, ¶ 3.

Next, plaintiff contends that defendant "knowingly [led] [p]laintiff deeper and deeper into the IPO process when [d]efendant knew or should have known it could not complete that process." *Id*. Plaintiff bases this allegation on its claim that "the entire team of [d]efendant's employees working on the IPO had resigned and were joining another investment bank" and that defendant "made no presale activities, arranged no meeting with investors, nor did [d]efendant attempt to go on a roadshow." *Id*. ¶ 30. In its opposition, plaintiff further states that "[d]efendant made assurances regarding high valuations and bridge financing to lock plaintiff into an agreement, and then did nothing to obtain that financing and significantly reduced the promised valuation once plaintiff had too much invested into the process to back out." Pl.'s Opp'n 12. Plaintiff cites to *Abacus Fed. Sav. Bank v. ADT Sec. Servs., Inc.* stating "[t]hese allegations are not mere labels but factual allegations that, if proven, would support a finding of bad faith and gross negligence." 18 N.Y.3d at 683.

For its part, defendant argues that plaintiff's claim is "entirely conclusory and defies common sense." [Defendant's][8] Reply Brief in Support of Motion to Dismiss ("Def.'s Reply") 2. Defendant distinguishes the facts here from the facts in *Abacus* claiming that the plaintiff in *Abacus* did "allege[] specific facts that would show gross negligence." *Id*. That, defendant maintains, is not the case here. Defendant also contends that "[p]laintiff cannot reasonably

---

[8] Defendant's Reply Brief was incorrectly labeled as "Plaintiff's Reply Brief". *See* Dkt. No. 30.

argue that [d]efendant would waste time and money convincing [p]laintiff to proceed with a transaction that [d]efendant allegedly knew it could not consummate." *Id.*

Plaintiff's argument is unavailing. Again, while it is not disputed that defendant was obligated to provide certain specified services to plaintiff pursuant to the engagement letter, plaintiff has failed to plausibly allege that defendant was under an obligation to provide the services plaintiff now claims are found in the express language of the engagement letter, to wit, presale activities, meeting with investors, a roadshow, assurances of a high valuation and bridge financing. This argument is contradicted by the terms of the engagement letter itself. As such, the Court need not accept the allegations in the Complaint as true. *See Tuf America, Inc.,* 968 F. Supp. at 592. Plaintiff's focus should have been on what specifically did the engagement letter require defendant to do and whether defendant met its obligations.

Further, unsupported conclusory statements that defendant engaged in bad faith and gross negligence in its continuing the IPO process does not carry the day. Sparse and general allegations of what should have been obvious to defendant in the IPO process do not suffice. *See Twombly*, 550 U.S. at 555. Additionally, absent from the Complaint are sufficient factual allegations that defendant's replacement team was ill-equipped to handle the IPO process after the exodus of the team that had been engaged in the transaction. In short, plaintiff's analysis is insufficient to support its otherwise conclusory statement that defendant engaged in wrongful conduct or acted in derogation of its obligations under the engagement letter by continuing the IPO process and seeking to consummate the transaction as contemplated.

Finally, the Complaint alleges that defendant "deceptively convince[ed] [p]laintiff to publicly file a highly confidential [free writing prospectus] that was created solely for a roadshow that [d]efendant knew it could not do." Compl. ¶ 33. Once again, the absence of sufficient non-conclusory facts to plausibly suggest that defendant acted in bad faith or was grossly negligent in requesting plaintiff file a free writing prospectus in preparation for a

roadshow is glaring. In fact, the engagement letter specifically contemplates what plaintiff must file with the SEC and that such filing will be "in form reasonably satisfactory" to defendant. *See* Compl. Ex. A, ¶ 6 ("The Company will . . . prepare and file . . . a Registration Statement on Form S-1 . . . and a prospectus included therein (the 'Prospectus') covering the Shares to be sold in the Offering."). The Letter further provides that while the SEC is reviewing plaintiff's Form S-1, defendant may conduct a road show marketing trip, not that it shall conduct such trip. *See id.* ¶ 9 ("Joseph Gunnar may plan and arrange one or more 'road show' marketing trips for the Company's management to meet with prospective investors."). And yet again, the Court notes the absence of any well-pleaded factual allegations that the individuals working on the transaction were incapable of conducting a road show. Unsupported conclusory statements do not suffice. *Twombly*, 550 U.S. at 555.

In sum, plaintiff has not provided sufficient "factual enhancement" to allow the Court to conclude it has adequately and plausibly alleged defendant acted in bad faith or that its behavior was grossly negligent. *Chesapeake Energy Corp.*, 817 F. Supp. 2d at 312. Plaintiff's claims of bad faith and gross negligence are nothing more than "a legal conclusion couched as a factual allegation." *Id.* The Complaint here does not adequately and plausibly support plaintiff's claim that defendant's conduct approaches the level of "egregious intentional misbehavior evincing extreme culpability: malice, recklessness, deliberate or callous indifference to the rights of others, or an extensive pattern of wanton acts." *Constellation Brands, Inc. v. Keste, LLC*, 2014 U.S. Dist. LEXIS 159753, at *12 (W.D.N.Y. Nov. 13, 2014) (quoting *Myplaycity, Inc. v. Conduit Limited*, 2011 U.S. Dist. LEXIS 83552, at *7–8 (S.D.N.Y. Jul. 29, 2011)). As such, plaintiff has not sufficiently alleged a breach of the engagement letter by reason of acts of bad faith and gross negligence.

Because plaintiff has failed to sufficiently state a claim that defendant breached the engagement letter, the Court need not address whether plaintiff has properly pleaded damages flowing from the alleged brief. The Court does, however, observe that at the motion to dismiss stage, a plaintiff need not "specify the measure of damages nor plead … [specific] proof of causation." *LivePerson, Inc. v. 2417 Customer, Inc.*, 83 F. Supp. 3d 501, 516 (S.D.N.Y. 2015) (quotation omitted).

B.  Breach of the Implied Covenant of Good Faith and Fair Dealing

Plaintiff also alleges that defendant breached the implied covenant of good faith and fair dealing.  "Implicit in every contract is an implied covenant of good faith and fair dealing." *Gutierrez v. Gov't Emps. Ins. Co.*, 25 N.Y.S.3d 625, 627 (2d Dep't 2016). This implied covenant is "a pledge that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 773 N.E.2d 496, 500 (N.Y. 2002). The covenant of good faith and fair dealing is breached when a party acts in a manner that, although not expressly forbidden by the contractual provision, would deprive the other party of the benefits of the agreement. *Sorenson v. Bridge Capital Corp.*, 861 N.Y.S.2d 280, 282 (1st Dep't 2008). A "claim that defendants breached the implied covenant of good faith and fair dealing [may be] properly dismissed as duplicative of the breach of contract claim [when] both claims arise from the same facts." *Logan Advisors, LLC v. Patriarch Partners, LLC*, 879 N.Y.S.2d 463, 466 (1st Dep't 2009).

Here, plaintiff argues that defendant deprived it of the benefit of the bargain when defendant did not terminate the engagement when defendant knew it could no longer perform under the contract. Pl.'s Opp'n 14. Plaintiff admits, as defendant argues, that defendant was not obligated to terminate its participation in the transaction. *Id*. at 13; *see also* Def.'s Reply 3. However, plaintiff contends that once defendant knew it could not perform, it acted in bad

faith by not terminating the engagement thus freeing plaintiff to contract with another investment bank to gain the benefit of an IPO. *Id.*

Defendant argues that "because [p]laintiff's cause of action for breach of the implied covenant of good faith and fair dealing is based upon the same facts and predicated on the same terms of the [e]ngagement [l]etter as the [p]laintiff's breach of contract claims, as a matter of law, it also should be dismissed." Def.'s Mot. 3. Plaintiff counterargues that the underlying facts for its breach of contract claim are different than those alleged for the breach of the implied covenant of good faith and fair dealing. Pl.'s Opp'n 14. Specifically, plaintiff maintains that while the breach of contract claim is based on facts that "[d]efendant failed to use its best efforts to provide customary investment banking services," the breach of the implied covenant of good faith and fair dealing is based on the fact that "[d[efendant violat[ed] the spirit of the agreement by its refusal to release [p]laintiff from the restrictions of the Engagement Letter." *Id.*

Plaintiff's argument to the contrary is unpersuasive. The allegation that defendant breached the implied covenant of good faith and fair dealing arises from the same facts as plaintiff's breach of contract claim. In support of its claim that defendant breached the implied covenant of good faith and fair dealing, plaintiff again alleged, albeit in conclusory fashion, that defendant breached the engagement letter "by its gross  negligence and willful misconduct" and that it should have known it could not meet its performance duties under the engagement letter. Compl. ¶¶ 47, 48. These claims rest on the same factual allegations as plaintiff's breach of contract claim. Plaintiff also seeks the same damages on its claims for breach of the implied covenant and fair dealing and breach of contract.[9] Because the facts

---

[9] The damages sought for each claim are identical, $75 million loss of valuation and $33 million in lost revenue. Compl. ¶¶ 44, 45 (damages sought for breach of contract claim), ¶¶ 49, 50 (damages sought for breach of the implied covenant of good faith and fair dealing).

upon which both claims are predicated are identical and both claims seek identical damages, plaintiff's claim for breach of the implied covenant of good faith and fair dealing is dismissed as duplicative. "Under New York law, claims are duplicative when both 'arise from the same facts and seek the identical damages for each alleged breach,'" *Deutsche Bank Nat'l Tr. Co. v. Quicken Loans Inc.*, 810 F.3d 861, 869 (2d Cir. 2015) (quoting *Amcan Holdings, Inc. v. Canadian Imperial Bank of Com.*, 894 N.Y.S.2d 47, 49–50 (1st Dep't 2010)); *Logan Advisors, LLC,* 879 N.Y.S.2d at 466.

CONCLUSION

For the reasons set forth above, defendant's motion to dismiss the Complaint is granted. In its motion, defendant asked that the Complaint be dismissed with prejudice. The Court declines to do so. Although in opposing defendant's motion to dismiss the Complaint, plaintiff did not request leave to amend should the Court find in favor of defendant, plaintiff may decide that the defects identified by the Court can be remedied. If plaintiff chooses to seek leave to amend the Complaint, so long as it has a good faith basis to do so, it must file a motion for leave to amend within 14 days of the date of this decision.

So Ordered.



**Dated: February 25, 2022**
**Central Islip, New York**

**Louis A. Scarcella**
**United States Bankruptcy Judge**